**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| SPARK MULTINATIONAL, LLC, | § | |
| | § | |
|   Plaintiff, | § | |
| | § | |
| v. | § | EP-22-CV-00030-FM |
| | § | |
| YONG XING LIMITED, | § | |
| | § | |
|   Defendants. | § | |

**ORDER GRANTING DEFAULT JUDGMENT**

Before the court is "Motion for Default Judgment" ("Motion") [ECF No. 12], filed October 27, 2022, by Spark Multinational, LLC ("Spark" or "Plaintiff"). Therein, Plaintiff requests default judgment against Yong Xing Limited ("Yong Xing" or "Defendant").[1] After due consideration the Motion is **GRANTED**.

**I.     BACKGROUND**

"Yong Xing is an international trading and export company located in Shenzhen, China. Spark is an international trading company located in El Paso, Texas."[2] In August 2020, Yong Xing agreed to sell Sparks 8,200 cases of nitrile examination gloves in small, medium and large sizes for $639,600, plus shipping costs.[3]

During negotiation of the sale, Yong Xing sent Spark a sample case that "appeared to be compliant with Spark's order."[4] Satisfied with the sample, Spark sent Yong Xing a partial

---

[1] "Motion for Default Judgment" ("Mot.") 1 ¶ 1, 3 ¶ 9, ECF No. 12, filed Oct. 27, 2022.

[2] "Plaintiff's First Amended Complaint" ("Am. Compl.") 3 ¶ 8, ECF No. 4, filed Mar. 1, 2022.

[3] *Id.* at 3 ¶¶ 9–10.

[4] *Id.* at 3 ¶ 10.

1

payment.[5] "After shipping the gloves, Yong Xing provided Spark with an inspection report . . . purportedly . . . showing that the shipment conformed with all inspection criteria including quantity, quality, workmanship, and labeling."[6] Spark then paid the remainder of the order price and "all costs associated with the delivery."[7]

"Regrettably, the inspection report proved to be false."[8] The gloves delivered did not comply with Spark's order and "did not match those provided in the 'sample' case."[9] They "were made of latex, had powder, were the wrong colors and sizes, and packaged with false labeling (e.g., an inner box of '100' gloves would contain 50 or less). [Citation]. Furthermore, many gloves were used, broken, or otherwise not fit for sale."[10]

"Spark purchased gloves from Yong Xing in order to fulfill a contractual obligation to its largest customer as well as to sell on the open market."[11] "Upon receipt of the defective gloves, Spark's customer rejected the delivery and Spark was left to warehouse the gloves and scramble to cover its order. This caused irreparable damage to Spark's customer goodwill and forced it to buy gloves on the open market at a premium in order to fulfill its contractual obligations with its customer. Furthermore, given the delay, Spark lost the opportunity to sell gloves as planned on the open market and therefore suffered major opportunity costs."[12]

---

[5] *Id*. at 4 ¶ 11.

[6] *Id*.

[7] *Id*.

[8] *Id*. at 4 ¶ 12.

[9] *Id*. at 4 ¶ 13.

[10] *Id*.

[11] *Id*. at 4 ¶ 12.

[12] *Id*. at 4–5 ¶ 14.

Yong Xing then "provided Spark with a $100,000 refund and $41,806 credit."[13] Unsatisfied, "Spark demanded full repayment."[14] In response, "Yong Xing requested Spark ship 100 cases to Cambodia—where the gloves shipped out of—for an 'inspection.' Spark did so, incurring all the costs of shipment to Cambodia."[15] "Additionally, Yong Xing arranged for a third-party inspection of the delivered gloves in El Paso, Texas," which "concluded that the gloves failed in terms of 'Packaging and Labeling,' 'Product Description,' and 'Workmanship.'"[16] Nevertheless, Yong Xing did not reimburse Spark.[17]

In September 2021, "counsel for Spark sent a demand letter to Yong Xing . . . demanding reimbursement and compensation for damages associated with Yong Xing's conduct. [Citation]. Yong Xing did not respond."[18]

In January 2022, Plaintiff filed a complaint asserting claims for breach of contract, violation of the Texas Deceptive Trade Practices Act ("DTPA"), fraudulent inducement, money had and received, and unjust enrichment.[19] Defendant was served in April,[20] but failed to appear.

---

[13] *Id*. at 5 ¶ 15.

[14] *Id*. at 5 ¶ 16.

[15] *Id*.

[16] *Id*. at 5 ¶ 17 (emphasis removed).

[17] *Id*. at 5 ¶ 16.

[18] *Id*. at 5 ¶ 18.

[19] *Id.* at 6–11.

[20] "Affidavit of Process Server" 1, ECF No. 7, filed May 31, 2022.

In August, upon request by Plaintiff, the Clerk of Court entered default against Defendant.[21] Two months later, Plaintiff filed the instant Motion seeking default judgment.[22]

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure ("Rule") 55(a), "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, . . . the clerk must enter the party's default." After a defendant's default has been entered, a plaintiff may apply for a judgment based on such default.[23] "A default judgment is a judgment on the merits that conclusively establishes the defendant's liability."[24] Rule 55(b) provides two means by which a plaintiff may obtain an entry of default judgment. Under certain circumstances, the plaintiff may apply to the clerk of the court for the entry of default judgment.[25] In all others, the party entitled to a judgment by default must apply to the court.[26]

"[A] defendant's default does not in itself warrant the court in entering a default judgment. There must be a sufficient basis in the pleadings for the judgment entered."[27] In evaluating what constitutes a "sufficient basis" for a default judgment, the Fifth Circuit held sufficiency is based on the standards of Rule 8:

> Rule 8(a)(2) requires a pleading to contain a short and plain statement of the claim showing that the pleader is entitled to relief. The purpose of this requirement is to give the defendant fair notice of what the claim is and the grounds upon which it rests. The factual allegations in the complaint need only be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in

---

[21] "Clerk's Entry of Default" 1, ECF No. 11, filed Aug. 19, 2022.

[22] *See* Mot.

[23] FED. R. CIV. P. 55(b); *New York Life Ins. Co.*, 84 F.3d at 141.

[24] *United States ex rel. M-CO Constr., Inc. v. Shipco Gen., Inc.*, 814 F.2d 1011, 1014 (5th Cir. 1987).

[25] FED. R. CIV. P. 55(b)(1).

[26] FED. R. CIV. P. 55(b)(2).

[27] *Nishimatsu Constr. Co., Ltd. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) (footnote omitted).

the complaint are true (even if doubtful in fact). Detailed factual allegations are not required, but the pleading must present more than an unadorned, the-defendant-unlawfully-harmed-me accusation.[28]

### III. DISCUSSION

#### A. *Whether Plaintiff is Entitled to Relief*

Plaintiff asserts claims for breach of contract, violation of the DTPA, and fraudulent inducement.[29] Alternative to breach of contract, Plaintiff asserts claims of unjust enrichment and money had and received.[30]

##### a. Breach of Contract

"To prevail on a breach of contract claim, a party must establish the following elements: (1) a valid contract existed between the plaintiff and the defendant; (2) the plaintiff tendered performance or was excused from doing so; (3) the defendant breached the terms of the contract; and (4) the plaintiff sustained damages as a result of the defendant's breach."[31]

Plaintiff has adequately pled existence of a contract. Evidence shows that Plaintiff agreed to purchase 8,200 cases of blue powder-free, nitrile examination gloves in small, medium, and large sizes from Defendant.[32] Each case contained ten 100-glove boxes, which were $7.80 apiece.[33]

---

[28] *Wooten v. McDonald Transit Assocs, Inc.*, 788 F.3d 490, 498 (5th Cir. 2015) (quoting FED. R. CIV. P. 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

[29] Am. Compl. at 6–9.

[30] *Id.* at 9–11.

[31] *Atrium Med. Ctr., LP v. Houston Red C LLC*, 546 S.W.3d 305, 311 (Tex. App. 2017).

[32] "Plaintiff's Complaint" ("Compl."), Ex. A, "Purchase Order" 1, ECF No. 1-1, filed Jan. 20, 2022 (purchase order for blue powder-free nitrile gloves in small, medium, and large sizes); Compl., Ex. B, "Freight Receipt 1" 1, ECF No. 1-2, filed Jan. 20, 2022 (freight receipt for 4,000 cases); Compl., Ex. C, "Freight Receipt 2" 1, ECF No. 1-3, filed Jan. 20, 2022 (freight receipt for 4,200 cases).

[33] Am. Compl. at 1 n. 1; Purchase Order at 1 (purchase order showing $7.80 price per box of 100 gloves).

Thus, the contract was valued at $639,600, for which Plaintiff paid Defendant in full.[34]

However, an inspection of the delivery Plaintiff received shows the delivery failed to conform to the contract specifications: gloves came in at least thirteen different colors; many were of a non-nitrile material; others were damaged or otherwise defective; no box contained 100 gloves (they ranged from forty to eighty-seven); many cases were unmarked as to glove size or color; and still others had the incorrect color marked.[35]

Finally, Plaintiff suffered damages due to Defendant's breach. Plaintiff paid: $639,600 for the gloves; $54,829.30 for shipping and related fees; $3,820 to return 1,000 cases to Cambodia for inspection; and $26,837.61 in labor costs associated with storing, sorting, and inspecting the delivery after its customer rejected the gloves.[36] These initial damages thus totaled $725,086.91. Defendant then refunded Plaintiff $100,000 and gave it a $41,806 credit, reducing damages to $583,280.91.[37] Subsequently, however, Plaintiff paid heftily on the open market to secure replacement gloves necessary to fulfil its contractual obligations to its customer.[38]

Plaintiff has established a breach of contract claim.

---

[34] Am. Compl. at 4 ¶ 11.

[35] Compl., Ex. G, "Failed Inspection Report" 4–14, ECF No. 1-7, filed Jan. 20, 2022.

[36] Mot., Ex. A-1, "Actual Damages Tally" 1, ECF No. 12-3, filed Oct. 27, 2022.

[37] Am. Compl. at 5 ¶ 15.

[38] *Id.* at 4 ¶ 14.

b. Texas Deceptive Trade Practices Act

"Generally, the elements of a DTPA action are (1) the plaintiff is a consumer, (2) the defendant engaged in false, misleading, or deceptive acts, and (3) these acts constituted a producing cause of the consumer's damages."[39]

The DTPA defines a consumer to include any partnership or corporation that has assets below $25 million who seeks to purchase "any goods or services" and who is not "owned or controlled by a corporation or entity with assets of $25 million or more."[40] Plaintiff avers it is a consumer as so defined.[41]

Unlawful deceptive trade practices under the DTPA include "representing that goods are original or new if they are deteriorated, reconditioned, reclaimed, used, or secondhand," "of a particular standard, quality, or grade," or "of a particular style or model, if they are of another."[42] Defendant agreed to sell Plaintiff 8,200 cases of blue nitrile examination gloves, sent Plaintiff a correct representative sample, sent an inspection report purportedly confirming the delivery conformed to specifications, and yet shipped Plaintiff gloves that variously and extensively failed to satisfy the agreement.

Finally, as discussed above Plaintiff was damaged by Defendant's deception.

Plaintiff has established a DTPA claim.

---

[39] *HHH Farms, L.L.C. v. Fannin Bank*, 648 S.W.3d 387, 416 (Tex. App. 2022) (citation and internal quotation marks omitted).

[40] TEX. BUS. & COM. CODE § 17.45(4).

[41] Am. Compl. at 7 ¶ 30.

[42] TEX. BUS. & COM. CODE § 17.46.

        c.      Fraudulent Inducement

A fraudulent inducement claim "requires proof that: (1) the defendant made a material misrepresentation; (2) the defendant knew at the time that the representation was false or lacked knowledge of its truth; (3) the defendant intended that the plaintiff should rely or act on the misrepresentation; (4) the plaintiff relied on the misrepresentation; and (5) the plaintiff's reliance on the misrepresentation caused injury."[43]

Here, Defendant represented that it would sell Plaintiff 8,200 cases of blue nitrile examination gloves. These specifications were material to Plaintiff. The false inspection report Defendant gave Plaintiff as well as the sheer scope of Defendant's failure to properly deliver supports the inference that Defendant knew its representation was false. Further, by sending Plaintiff a conforming sample, when it later turned out that no secondarily-inspected box conformed, Defendant plausibly intended for Plaintiff to rely and act on its misrepresentation, which Plaintiff did. Finally, as explained above, Plaintiff's reliance on Defendant's misrepresentation caused it injury.

Plaintiff has established a fraudulent inducement claim.

        d.      Unjust Enrichment and Money Had and Received

In the alternative to its breach of contract claim, Plaintiff asserts claims of unjust enrichment and money had and received. Because Plaintiff has adequately pled its breach of contract claim, the court need not address these secondary claims, which are of a type that tend to arise only in the absence of a contractual agreement.

---

[43] *Int'l Bus. Machs. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228 (Tex. 2019).

*B.     Award*

Plaintiff prays for an award of actual damages resulting from Defendant's breach of contract, treble damages under the DTPA, exemplary damages for Defendant's fraudulent inducement, attorneys' fees and costs, and pre- and post-judgment interest.

a.     Actual Damages

Plaintiff seeks recovery in the amount of $1,592,700.91 in actual damages due to Defendant's breach of contract.[44] For starters, Plaintiff paid the full contract price of $639,600 for the gloves; $54,829.30 for shipping and related fees; $3,820 to return 1,000 cases to Cambodia for inspection; and $26,837.61 in labor costs associated with storing, sorting, and inspecting the delivery, all of which totaled $725,086.91.[45] Defendant then refunded Plaintiff $100,000 and gave it a $41,806 credit, reducing damages to $583,280.91.[46] Subsequently, however, Plaintiff also paid $1,009,420 on the open market to secure replacement gloves and cover Defendant's breach,[47] bringing total costs to $1,592,700.91.

When a buyer rightfully rejects non-conforming goods in its possession, it may recover as much of the contract price as it has paid as well as "any expenses reasonably incurred" in the "inspection, receipt, transportation, care and custody" of those goods.[48] Following a breach of contract, a buyer "may 'cover' by making in good faith and without unreasonable delay any

---

[44] Mot. at 4 ¶ 10.

[45] *Id*., Ex. A-1, "Actual Damages Tally" 1, ECF No. 12-3, filed Oct. 27, 2022.

[46] Am. Compl. at 5 ¶ 15.

[47] Actual Damages Tally at 1; Mot., Ex. A-2, "Replacement Gloves Purchase List" 1, ECF No. 12-4, filed Oct. 27, 2022.

[48] TEX. BUS. & COM. CODE § 2.711.

reasonable purchase of . . . goods in substitution for those due from the seller."[49] "The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages . . . , but less expenses saved in consequence of the seller's breach." In other words, recovery should put the non-breaching party in the position it would have been had the contract been performed.

Here, Plaintiff paid $1,009,420 for replacement gloves and $583,280.91 in pre-cover damages, totaling $1,592,700.91. Plaintiff was only supposed to pay $694,429.30 ($639,600 for the gloves and $54,829.30 for shipping and related fees), however.[50] It may recover, then, the difference between what it paid and what it should have paid ($1,592,700.91 minus $694,429.30).

Accordingly, Plaintiff is entitled to recover $898,271.61 in actual damages (not $1,592,700.91, as claimed).

        b.    DTPA Treble Damages

Plaintiff moves for treble damages pursuant to the DTPA, which permits a trier of fact to award "not more than three times the amount of economic damages" when the defendant's conduct was committed knowingly.[51] The court has found that Defendant committed its conduct knowingly by virtue of the false inspection report it gave Plaintiff and the sheer scope of its failure to properly deliver. Plaintiff is therefore awarded $2,694,814.83 in DTPA damages (i.e., three times its actual damages).

---

[49] *Id.* at § 2.712(a).

[50] Am. Compl. at 3 ¶ 9 ("Yong Xing agreed to sell 8,200 cases of latex-free, powder-free nitrile examination gloves to Spark for $639,600, plus shipping costs."); Freight Receipt 1 ($4,300 to ship first batch); Freight Receipt 2 ($4,300 to ship second batch); Mot., Ex. A-5, "Customs Brokerage Receipt" 1, ECF No. 12-7, filed Oct. 27, 2022 ($46,229.30 for U.S. customs broker).

[51] Am. Compl. at 8 ¶ 34; TEX. BUS. & COM. CODE § 17.50(b)(1).

c. Exemplary Damages

Plaintiff seeks exemplary damages due to Defendant's fraudulent inducement pursuant to section 41.003 of the Texas Civil Practice and Remedies Code.[52] That statute allows for exemplary damages "only if the claimant proves by clear and convincing evidence that the harm" from which they seek to recover resulted from fraud, malice, or gross negligence.[53]

However, "[e]xemplary damages may not be awarded to a claimant who elects to have his recovery multiplied under another statute."[54] Because Plaintiff seeks multiplied damages under the DTPA, which the court has awarded, it may not recover exemplary damages.

d. Attorneys' Fees and Costs

Plaintiff seeks an award of $16,377.05 in attorneys' fees and costs.[55] The Fifth Circuit uses the "lodestar" method for calculating reasonable attorneys' fees.[56] The court first multiplies the "number of hours reasonably expended by an appropriate hourly rate in the community for such work."[57] The court may then "decrease or enhance the lodestar based on the relative weights of the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.*"[58] These twelve factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the

---

[52] Mot. at 5 ¶ 12 (citing TEX. CIV. PRAC. & REM. CODE § 41.003(a)).

[53] TEX. CIV. PRAC. & REM. CODE § 41.003(a).

[54] *Id.* at § 41.004(b).

[55] Mot. at 5 ¶ 13.

[56] *Heidtman v. County of El Paso*, 171 F.3d 1038, 1043 (5th Cir. 1999) (citing *Fender v. Zapata P'ship, Ltd.*, 12 F.3d 480, 487 (5th Cir. 1994)).

[57] *Id.* (citing *Shipes v. Trinity Inds.*, 987 F.2d 311, 319–20 (5th Cir. 1993)).

[58] *Id.* (citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974)).

attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the result obtained; (9) the experience, reputation, and ability of the attorney's; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.[59]

Two attorneys worked on Plaintiff's case, a partner and an associate.[60] The former expended 6.25 hours on this matter at an average hourly rate of $791.92 ($4,949.50 total) while the latter expended 13.2 hours at an average hourly rate of $425.91 ($5,622 total).[61] After considering the *Johnson* factors listed above, the court finds these fees to be fair and reasonable considering the work performed.

In addition to attorneys' fees, "Spark incurred out-of-pocket costs for this matter, including for automated research, postage, international service of process and translation services," totaling $5,805.55.[62] Accordingly, Plaintiff is entitled to recover $10,571.50 in attorneys' fees plus $5,805.55 in related costs for a total of $16,377.05.

        e.    Interest

Plaintiff also moves for an award of pre- and post-judgment interest.[63] "State law governs the award of prejudgment interest in diversity cases."[64] "Under Texas law, pre-judgment interest

---

[59] *Johnson*, 488 F.2d at 717–19.

[60] Mot., Ex. B, "Declaration of Matthew W. Caligur" 2–3, ECF No. 12-8, filed Oct. 27, 2022.

[61] *Id*.

[62] *Id*. at 3.

[63] Mot. at 7.

[64] *Meaux Surface Protection, Inc. v. Fogleman*, 607 F.3d 161, 172 (5th Cir. 2010) (citation and internal quotation marks omitted).

on damages is awarded as a matter of course when the trier of fact finds that damages accrued before the time of judgment."[65] The interest rate to be applied is five percent minimum.[66] Plaintiff is entitled to $898,271.61 in actual damages. Thus, it is also entitled to $44,914 in pre-judgment interest.[67]

Plaintiff is also entitled to post-judgment interest, which is "awarded as a matter of course."[68] Post-judgment interest is "calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield."[69]

### IV. CONCLUSION

Accordingly, the court enters the following orders:

1. It is **HEREBY ORDERED** that "Motion for Default Judgment – Hearing Requested" [ECF No. 12] is **GRANTED**.

2. It is **FURTHER ORDERED** that Plaintiff is entitled to:
   a. $898,271.61 in actual damages;
   b. $2,694,814.83 in DTPA damages;
   c. $16,377.05 in attorneys' fees and related costs;
   d. $44,914 in pre-judgment interest; and
   e. post-judgment interest pursuant to 28 U.S.C. § 1961.

**SIGNED AND ENTERED** this **17th** day of **March 2023.**

  _____
  **FRANK MONTALVO**
  **UNITED STATES DISTRICT JUDGE**

---

[65] *U.S. Metals, Inc. v. Liberty Ins. Corp.*, No. 12-CV-00379, 2018 WL 11357088, at *3 (S.D. Tex. May 25, 2018) (citation and internal quotation marks omitted).

[66] *Id.*

[67] Pre-judgment interest may not be applied to additional damages awarded under the DTPA. TEX. BUS. & COM. CODE § 17.50(b) and (f)(2).

[68] *Meaux Surface Protection*, 607 F.3d at 173.

[69] 28 U.S.C. § 1961(a).